**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | **CRIMINAL NOS. 18-30-1, 7, 8** |
| : | |
| **v.** : | |
| : | |
| **PAUL GIRARD a/k/a "Bogus"** : | |
| **KAREEM HARRY a/k/a "Crumbull"** : | |
| **TYLER EUGENE a/k/a "Lucc"** : | |

**MEMORANDUM OPINION**

**Savage, J.**                                                                                                         **May 22, 2024**

After a three-week trial, defendants Paul Girard, Kareem Harry, and Tyler Eugene were found guilty of various offenses, including racketeering, kidnapping, drug distribution, robbery, murder, and other violent crimes. The defendants have each filed a motion for judgment of acquittal under Rule 29 or, in the alternative, a new trial under Rule 33. They join in each other's grounds and arguments.

**Sufficiency of the Evidence**

By his own words captured on recorded prison phone calls, intercepted calls from smuggled cell phones in prison, and retrieved text messages, Girard revealed himself as the leader and mastermind of a gang engaged in robberies, drug trafficking, kidnapping, and murders. The communications disclosed how he planned, directed, and ordered the crimes. In some calls, he listened and gave orders as crimes were being committed. They also demonstrated the roles co-defendants Harry and Eugene played in the gang and how they participated in various charged crimes.

*Girard's Role*

Girard's second-in-command, Robert Brown, described how the gang operated and was controlled by Girard. He provided details of the crimes in which he, Harry and

Eugene participated as members of the gang.  He testified that following Girard's orders, he took out "hits" on people, including the attempted murders of Mario Daniels and Kareem Mathias on November 26, 2015, and the murders of Jerome Williams and Juan Encarnacion.[1]  Also on Girard's orders, Brown and another gang member rented a car and armed themselves to attack a rival gang by shooting into the rival's car.[2] He described trafficking narcotics through the St. Croix airport on Girard's orders with money provided by Girard that Girard had obtained from jewelry store robberies.[3]  Brown recounted how he, Girard, and an accomplice robbed the Cleopatra jewelry store on August 30, 2011. He also testified that Girard planned the September 16, 2013, robbery of Gems and Gold Corner store and explained how it was carried out by other gang members.[4]  Brown recounted that Girard planned and directed the kidnapping of bank manager, Claudette Honoré, on December 21, 2014.[5]

Jakeem Emmanuel, who pleaded guilty to robberies orchestrated by Girard, corroborated Brown's testimony. He testified that Girard recruited him to commit a robbery in Signature Jewelers store on August 19, 2015, and 3G's Jewelry and Repair on September 15, 2015.[6]  During the robberies, Girard was on the phone with Emmanuel. After the robbery, Girard instructed Emmanuel to add money to his prison commissary account.  Emmanuel also testified that Girard recruited him to rob Scotiabank and sent

---

[1] Brown Trial Tr., Mar. 9, 2022, at 57-61, 101-102, 133, 137, 167. The trial transcripts cited are referenced using the name of the witness.

[2] *Id.* at 104-107.

[3] Brown Trial Tr., Mar. 8, 2022, at 50.

[4] *Id.* at 23.

[5] *Id.* at 43.

[6] Emmanuel Trial Tr., Mar. 7, 2022, at 10, 38-39.

him to pick up firearms to use in the robbery.[7] The robbery was thwarted when police officers began to follow Emmanuel and his accomplice after the pair ran a red light.[8]

Etherneal Simon testified that she was Girard's treasurer and travel agent. She explained that she held Girard's money and distributed it to his prison account, arranged for rental cars to use in the commission of crimes, and made a flight arrangement for one of Girard's soldiers to fly to St. Thomas to murder Girard's former girlfriend.[9]

*Harry's Role*

Brown testified that Harry was the gang's armorer, storing the gang's firearms and supplying them to gang members to use in crimes ordered by Girard.[10] He also assembled crews for specific jobs.[11]

Brown implicated Harry in the murder of Jermaine Williams, whose execution Girard had ordered for robbing Brown of drugs.[12] He testified how Harry played a part in planning the murder and acted as a lookout, reporting to Girard in real time as the plan was carried out.[13] Harry told Girard where Williams could be ambushed and what kind of car he would be driving. He reported the target's movements to Girard. Footage from the school where Williams was shot shows Harry going into the school while on the phone,

---

[7] *Id.* at 65-73.

[8] *Id*. at 72.

[9] Simon Trial Tr., Mar. 8, 2022, at 8, 13, 16-17

[10] Brown Trial Tr., Mar. 8, 2022, at 103, 135.

[11] *Id.* at 135.

[12] *Id.* at 51-57.

[13] *Id.* at 60-67. The government presented call log exhibits showing calls between Harry and Girard at the day and time of the shooting. Gov't Ex. 08-925-D.

leaving and driving away, and then returning a short time later.[14] After the murder, Harry warned Girard that police were looking for the rental car used by the shooters.[15]

Girard planned a bank robbery, intending to kidnap and force Claudette Honoré, a bank employee, to open the bank vault. Brown explained how Harry remained outside Honoré's home acting as a lookout while other gang members threatened her and her family inside.[16] On a call with Girard, Harry alerted him that police had arrived.[17]

Brown also testified that Harry was the getaway driver for the July 21, 2014, murder of Eddie Harriette, in which Jahida Escobar and George Weeks were also shot.[18] On a call, Brown, Girard and Harry, discussed Harry paying the Lower Love Gas Station attendant to delete video surveillance that might have captured the shooting.[19]

Emmanuel corroborated Brown's testimony that Harry was the armorer. Emmanuel testified that Girard sent Harry to deliver a duffel bag with an AR-15 and a glock.[20]

### *Eugene's Role*

Eugene's role in the gang was revealed in a call with Girard, his boss. In a February 28, 2016, call among Girard, Brown and Eugene, Brown and Eugene informed Girard that they had spotted rival gang members and discussed how to shoot them.[21]

---

[14] Gov't Exs. 08-3002 & 08-3003.

[15] Brown Trial Tr., Mar. 8, 2022, at 74.

[16] *Id.* at 46-47. Harry was outside the house because he and Ms. Honoré knew each other. *Id.*

[17] *Id.* at 44.

[18] *Id.* at 36.

[19] *Id.* at 38-39.

[20] Emmanuel Trial Tr., Mar. 7, 2022, at 61.

[21] Gov't Ex. 00-825-T at 2.

Eugene complained that he could not shoot them while he was in his partner's mother's car.[22]

In another call that day, Girard ordered Eugene to kill Taniesha Williams in St. Thomas.[23] Later, in another call, Girard, Prentice and Simon discussed how Simon would make flight arrangements for Eugene to travel to St. Thomas to kill Williams.[24] These calls demonstrate that Eugene was a soldier who carried out Girard's orders and reported to him. They corroborated Brown's testimony that Eugene was a member of the gang.

Brown explained Eugene's role in the attempted murder of Daniym Heywood, a rival gang member, in the Walter I.M. Hodge housing community on December 9, 2015.[25] Brown was on the phone with Eugene as Eugene drove into the housing community, saw Heywood, and started shooting until his gun jammed. Brown also testified that on February 2, 2016, he and Eugene rented a car to find and kill Heywood in Frederiksted, St. Croix. When they found Heywood, he was standing with two other people, including Juan Encarnacion. Eugene urged Brown to kill all three men. Although Brown aimed at Heywood, he ultimately shot and killed Encarnacion. After the shooting, Brown, Eugene, and another accomplice drove to another neighborhood to search for more members of the rival crew.[26]

Again, on March 12, 2015, Brown and Eugene teamed up to shoot rival gang members at Girard's direction. Their plan was thwarted when their rental car got a flat

---

[22] *Id.*

[23] Gov't Ex. 00-825.

[24] Gov't Ex. 826; Brown Trial Tr., Mar. 9, 2022, at 92-93.

[25] Brown Trial Tr., May 8, 2022, at 123; Brown Trial Tr., May 9, 2022, at 7-8.

[26] Brown Trial Tr., Mar. 9, 2022, at 57-62.

tire.[27] They abandoned the car and ran through the bushes to avoid gunfire from rival gang members and the police.[28] Brown related how they escaped, and Eugene had dropped his gun.[29] In text messages, Eugene and Brown discussed how the police recovered the gun Eugene had dropped.[30]

Citing the lack of physical evidence linking him to any crimes for which he was convicted, Eugene argues that his conviction rests solely on the uncorroborated testimony of Brown. Although he acknowledges his participation in intercepted phone calls with Brown and Girard provided evidence of his involvement in the conspiracy, he contends those conversations were inadmissible as uncharged conduct and were confusing and misleading to the jury.

The calls were admissible as statements made by co-conspirators during and in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E). Furthermore, the calls satisfied the *Stark* requirements for admissibility.[31] Consistent with our February 9, 2022, order, the co-conspirator statements were admitted under Rule 801(d)(2)(E) because the government proved that a conspiracy existed, the declarants and the defendants were members of the conspiracy, the statements were made in the course of the conspiracy, and the statements were made in furtherance of the conspiracy. The calls were "intrinsic" to the RICO charges. They revealed the existence and nature of the criminal conspiracy and Eugene's participation in it. *See United States v. Ali,* 493 F.3d

---

[27] *Id.* at 106-7.

[28] *Id.*

[29] *Id.*

[30] Gov't Ex. 1004-F at 438; Brown Trial Tr., Mar. 9, 2022, at 121.

[31] Order, ECF No. 1335.

387, 391-392 (3d Cir. 2007) (holding that in RICO conspiracy case evidence of uncharged crimes was probative of defendants' respective roles within the enterprise and were thus admissible under Fed. R. Evid. 403).

Despite the significant evidence implicating them, Eugene and Harry make much of what they call Brown's uncorroborated evidence. Even if Brown's testimony was not corroborated, the jury was free to accept it. Uncorroborated accomplice testimony can form the basis for a guilty verdict. *United States v. Salahuddin*, 765 F.3d 329, 346-47 (3d Cir. 2014); *United States v Perez*, 280 F.3d 318, 344 (3d Cir. 2002) (citations omitted).

Inconsistencies between a witness's prior statements and trial testimony do not necessarily require rejection of the testimony. Brown admitted he initially misled the agents and later implicated others to help himself. The jury was free to accept or reject his testimony. The jury was instructed on how to assess Brown's testimony as a cooperating witness and as an accomplice. The jury was directed to "examine and weigh the testimony of such a witness with great care and caution." In any event, Brown's testimony was corroborated by other witnesses and the incriminating telephone calls in which the defendants participated.

Contrary to the defendants' contention, Brown was not the only co-conspirator to expose the gang's inner workings. Jakeem Emmanuel and Etherneal Simon corroborated some of Brown's testimony. Emmanuel testified that Girard recruited him to participate in the Signature Jewelers robbery.[32] On August 19, 2015, Emmanuel and Turrell Thomas entered the Signature Jewelers store in St. Thomas, tied up two customers, and directed

---

[32] Emmanuel Trial Tr., Mar. 7, 2022, at 10-14.

7

the bank employee, a co-conspirator, to fill a bag with jewelry.[33]  Emmanuel had Girard on the phone during the robbery.[34]  Girard later directed Emmanuel to add money from the robbery to Girard's commissary account.[35]  Emmanuel related that Girard orchestrated the robbery of 3G's Jewelry and Repair.  On the morning of the robbery, Girard called 3G's to confirm the store was open.[36]  Emmanuel and an associate entered the store armed, tied up employees, and demanded money from a female employee.[37]  During the robbery, Emmanuel had Girard on the phone.[38]  He received $500 for the robbery, which Girard said was all he would receive "for right now."[39]

Etherneal Simon testified that, at Girard's direction, she safeguarded his money while he was incarcerated, sent money orders to his commissary account, accepted packages of drugs at her work address, and arranged for rental cars and flights for Girard's associates to engage in various criminal activities.[40]  Her testimony was corroborated by recorded telephone conversations she had with Girard.[41]

## Phone Calls

The prison calls were not as benign as Eugene suggests.  In one of three calls on February 28, 2016, Eugene described how he was looking for ways to "gun [ ] down" two

---

[33] *Id.* at 24-25.

[34] *Id.* at 22-23.

[35] *Id.* at 99.

[36] *Id.* at 45; Gov't Ex. 09-926-D.

[37] Emmanuel Trial Tr., Mar. 7, 2022, at 46.

[38] *Id.* at 53.

[39] *Id.* at 59.

[40] Simon Trial Tr., Mar. 8, 2022, at 8-13, 16-17.

[41] Gov't Exs. 807 & 809.

8

rival gang members he had located.[42]  In another call that day, Eugene agreed to carry out Girard's order to kill one of Girard's girlfriends.[43]  In a third call, Brown, Eugene and Simon discussed logistics to carry out the plan.[44]

Eugene argues the calls relate to uncharged conduct and should have been excluded as prejudicial.  The evidence was relevant to show Eugene's willingness to act on Girard's orders.  The calls also identified Eugene as a part of Girard's gang willing to commit murder.

## Witnesses

Harry complains that after an off-the-record discussion, several potential witnesses were precluded from testifying.  He mischaracterizes it as a hearing and what happened.

The conference in chambers was held to discuss scheduling and allow the government to prepare in order to manage the trial in an efficient manner.  Harry's counsel was asked to proffer each witness's testimony to gauge the time to present the testimony for scheduling purposes.  Without ruling, the court suggested how and why it would likely rule with respect to each person Harry identified, giving counsel an opportunity to cure any deficiency and plan the presentation of evidence.

One potential witness was Jasheen Simmonds who supposedly found in a prison cell an unsigned, undated piece of paper containing a list of names, some of which were crossed out.  Although Harry now claims this would have impeached Brown's testimony, his counsel could not connect the document to Brown or anyone else.  Its origin and its author were unknown.  Significantly, it was never produced.

---

[42] Gov't Ex. 824.
[43] Gov't Ex. 825.
[44] Gov't Ex. 826.

Harry requested writs *ad testificandum* for Ivan James, Shaquielle Correa and James Cruz.[45] Counsel for all three advised that they would not testify and, if called, would invoke their Fifth Amendment privilege.[46] James, the leader of a rival gang, was under indictment for charges that formed the background for testimony Harry sought to elicit. He was awaiting trial. His attorney insisted he would not testify if called.

Correa and Cruz, two co-defendants who had pleaded guilty pursuant to plea agreements, had not yet been sentenced.[47] Both, through their attorneys who had conferred with them about testifying, represented that they intended to invoke their Fifth Amendment privilege.

James, Correa, and Cruz were not precluded from testifying. They chose not to testify. They could not be compelled to testify. Furthermore, Harry did not articulate what evidence they would have provided.

The records from the Legislature and Premiere Wine and Spirits could have established that Harry had worked there at some time. The testimony was not offered as alibi testimony. Indeed, Harry had not provided notice of alibi.

The custodian of Kmart's records could have confirmed that both Harry and Claudette Honoré worked together at Kmart. This was relevant to show he was not at her house during the kidnapping. Harry did not call the custodian because Ms. Honoré testified that she worked with Harry, establishing that they knew each other.

---

[45] Appl. for Writ of *Habeas Corpus ad Testificandum*, ECF No. 1423; Appl. for Writ of *Habeas Corpus ad Testificandum*, ECF No. 1424; Appl. for Writ of *Habeas Corpus ad Testificandum*, ECF No. 1448.

[46] Opp'n to Mot. For Writ of *Habeas Corpus ad Testificandum* For James Cruz ¶ 13, ECF No. 1428 ["Resp. to James Cruz Writ"]; Mot. for Joinder in James Cruz's Opp'n to Mot. for Writ of *Habeas Corpus Ad Testificandum* (ECF No. 1428) ¶ 5, ECF No. 1429.

[47] Plea Agreement, Shaquielle Correa, ECF No. 1398; Resp. to James Cruz Writ ¶ 7.

Harry did not proffer on the record any witness that he now contends was precluded. He called only two witnesses on his list, Ms. Honoré and Courtney Hicks.

With respect to Harry's claim that he was improperly excluded from a court proceeding discussing his list of witnesses, there was no proceeding. It was a trial management conference at which his presence was not required. *See* Fed. R. Crim. P. 43(b)(3). Harry's counsel did not request that he be present or object to discussing the witnesses in his absence.

To establish a Sixth Amendment right to compulsory process violation, the defendant must show that: (1) he was denied the opportunity to present favorable evidence; (2) the excluded evidence was material to his defense; and (3) the exclusion was "arbitrary or disproportionate to a legitimate evidentiary or procedural purpose." *Gov't of Virgin Islands v. Mills,* 956 F.2d 443, 446 (3d Cir. 1992) (citing to *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). The burden is on the defendant to prove the materiality of the witness. *United States v. Cruz-Jimenez*, 977 F.2d 95, 103 (3d Cir. 1992). The evidence is material only if it is reasonably likely to have affected the judgment of the trier of fact. *United States v. Valenzuela-Bernard*, 458 U.S. 858, 873-74 (1982).

In any event, none of the witnesses whom Harry erroneously contends were excluded would have provided material evidence favorable to him.

## Public Trial

Contrary to the defendants' complaint, the trial was not closed to the public. The trial was conducted under COVID-19 protocols, calling for masking and social distancing. The latter necessarily limited available seating for the public in the gallery. Seats were available on a first-come basis. Those wishing to observe the trial who could not find a

seat in the courtroom could observe virtually in another courtroom that had been outfitted with a video livestream feed of the trial.

There were occasional glitches when the video transmission was interrupted. Whenever a problem was brought to the attention of the Court, it was corrected. The interruptions were "brief and resulted from the challenges of conducting a trial during a pandemic." *See United States v. Gallman*, 57 F.4th 122, 129 (3d Cir. 2023). In short, the public was not excluded from the trial.

## Security Measures

The defendants do not articulate how the security measures were "unconstitutionally impermissible." Given the nature of the charges and the number of defendants on trial who were in custody, there were additional Deputy United States Marshals and Court Security Officers detailed to the courtroom and courthouse. The deputies were in street clothes and dispersed throughout the courtroom. There was no apparent police presence. No deputy marshal or court security officer was identifiable as law enforcement. Additionally, none of the defendants were in shackles, handcuffs, or prison garb while in the presence of the jury. *See Holbrook v. Flynn*, 475 U.S. 560, 572 (1986) (holding that uniformed state troopers seated behind defendant in the first spectator row at trial was not "inherently prejudicial" and defendant failed to show actual prejudice that threatened his right to a fair trial).

## Conclusion

The evidence of Paul Girard, Kareem Harry, and Tyler Eugene's guilt was more than sufficient to support the verdict beyond a reasonable doubt. There were no trial errors to support a new trial. The public was not excluded from the trial and the security

measures employed during the trial were not prejudicial. Because the trial was conducted openly and fairly and the evidence against the defendants was overwhelming, we shall deny the motions for judgment for acquittal or new trial.